JOHN F. CALLAHAN *vs.* FIRST CONGREGATIONAL CHURCH OF
HAVERHILL & others.[1]

Suffolk. March 2, 2004. - May 18, 2004.

Present: GREANEY, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Jurisdiction,* Ecclesiastical controversy. *Constitutional Law,* Freedom of
religion. *Religion.*

This court concluded that under the Federal and State Constitutions,
congregational as well as hierarchical churches were entitled to autonomy
over church disputes touching on matters of doctrine, canon law, polity,
discipline, and ministerial relationships. [704-709]
In a civil action brought by a minister against a congregational church confer-
ence and several individual defendants, the judge deciding a motion to
dismiss for lack of subject matter jurisdiction erred in accepting as true the
plaintiff's factual allegations in the absence of affidavits from the
defendants, where the defendants attached several exhibits to their motion
that contested the accuracy, rather than the sufficiency, of the jurisdictional
facts that the plaintiff pleaded, and required the judge to address the merits
of the jurisdictional claim by resolving the factual disputes between the
plaintiff and the defendants. [709-711]
In a civil action brought by a minister against a congregational church confer-
ence and several individual defendants, the judge erred in denying a mo-
tion to dismiss for lack of subject matter jurisdiction, where, even accept-
ing as true the factual allegations in the plaintiff's complaint, the plaintiff's
claims against all of the defendants for intentional infliction of emotional
distress [714] and violation of G. L. c. 151B, § 4 [711-712]; against the
church conference and all but one of the individual defendants for defama-
tion [715-716]; against one individual defendant and the church conference
for breach of contract [712-713]; against several individual defendants for
tortious interference with prospective advantageous relationships [713-
714]; and against the church conference for violation of the plaintiff's right
to privacy [714-715] arose from the disciplinary review process initiated,
pursued, or conducted by the various defendants against the plaintiff;
however, while the judge erred in denying the motion to dismiss with rela-
tion to a claim of defamation against one individual defendant based on a
statement that could not reasonably be susceptible of a defamatory mean-
ing, the judge properly denied the motion with respect to other statements
of that defendant, in the same conversation, that arguably fell outside the
church disciplinary process [716-717].

---

[1]Robert Coppola, Robert Clark, Richard Smith, Susan Staples Smith,
Charles H. Harper, and the Massachusetts Conference of the United Church of
Christ.

CIVIL ACTION commenced in the Superior Court Department on June 29, 2001.

A motion to dismiss was heard by *Elizabeth M. Fahey,* J., and a motion to reconsider was also heard by her.

An application for leave to prosecute an interlocutory appeal was allowed by *Barbara A. Lenk,* J., in the Appeals Court. The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Donald C. Clark, Jr.,* of Illinois (*Diane Swierczynski* with him) for the defendants.

*Jessica Block* for the plaintiff.

SPINA, J. This case involves various claims arising from the plaintiff John F. Callahan's employment as an interim pastor of the First Congregational Church of Haverhill (Church) and the suspension of his privilege to be a minister by the Massachusetts Conference of the United Church of Christ (conference). The defendants moved to dismiss, Mass. R. Civ. P. 12 (b) (1), 365 Mass. 754 (1974), claiming the court has no subject matter jurisdiction over this purely ecclesiastical matter. A judge in the Superior Court denied the motion. Based on our decision in *Hiles* v. *Episcopal Diocese of Mass.,* 437 Mass. 505 (2002), however, she later reconsidered her denial. The judge concluded that the instant case is distinguishable from *Hiles* v. *Episcopal Diocese of Mass., supra,* largely because the defendant Church has a congregational rather than a hierarchical organization.[2] Noting that this court "has not yet explicitly outlined the scope and breadth of the congregational/hierarchical distinction in respect to church disputes not involving property issues," the judge again refused to dismiss the complaint. The defendants sought relief from a single justice of the Appeals Court, who treated the petition as a request for leave to pursue an interlocutory appeal, and authorized such appeal. We transferred the case here on our motion. See *CUNA Mut. Ins. Soc'y* v. *Attorney Gen.,* 380 Mass. 539, 540-541 (1980). Today we hold that

---

[2]The judge cited two other reasons for distinguishing the instant case from *Hiles* v. *Episcopal Diocese of Mass.,* 437 Mass. 505 (2002): the absence of affidavits from the defendants to support the motion to dismiss, cf. *id.* at 507, and the fact that "the events giving rise to Callahan's claims in this case took place after he resigned as Interim Pastor of [the Church]." Cf. *id.* at 507-510.

constitutional rights of religious freedom apply equally to congregational and hierarchical churches. These rights prohibit the court from exercising subject matter jurisdiction over the claims at issue, with the single exception of the defamation count against Robert Clark. We therefore vacate the order of the Superior Court and remand for proceedings consistent with this opinion.

1. *Background.* We summarize the allegations of the complaint as amended, supplemented by undisputed facts set forth in the exhibits submitted in support of, and in opposition to, the motion to dismiss.[3] In January, 1997, Callahan contracted with the defendant Church to serve as its "interim pastor" until the Church hired a permanent or "settled" pastor. An interim pastor is a specialized minister who leads the church during a transition period between settled pastors. Callahan previously had served as an interim pastor at a number of churches throughout New England during much of his thirty-five year career. According to Callahan, the first year of his tenure with the Church passed successfully. In 1998, however, a series of events transpired that he claims ultimately led to his resignation.

After Callahan expressed concerns about the Church's alleged "financial recordkeeping, lack of a recent audit, and apparent discrepancies and conflicts of interest," the "Church Council" responded by treating him with hostility.[4] Callahan alleges the hostility escalated in April, 1998, when he expressed concerns about certain actions taken by the search committee that was reviewing candidates for the settled pastor's position. Specifically, Callahan complained to the committee that it had failed to interview a white candidate who was married to an African-American woman, and that it had interviewed but failed to hire a woman that the committee allegedly "perceived to be a lesbian." In an interim pastor's report, Callahan had advocated adopting an "[o]pen and [a]ffirming" policy toward gay and lesbian candidates for the ministry, and against homophobia. Also in April, 1998, according to the complaint, Callahan experienced a "toxic reaction" to monosodium glutamate

---

[3]See Part 3, *infra.*

[4]The complaint does not identify what the "Church Council" is, nor does it specify the "hostile treatment" that Callahan allegedly received.

(MSG), which "temporarily disabled him." As a result of the allegedly hostile treatment he received after these occurrences, Callahan tendered his resignation from the Church on April 26, 1998, to be effective June 30, 1998. He applied for interim ministries at other, unspecified churches thereafter.

According to the amended complaint, in July, 1998, Robert Clark, the assistant to the Church moderator, had a conversation with Jean Roshon, a forum leader of the Church. Clark told Roshon "that he would do everything he could to ensure that Callahan never practiced ministry again." During that same conversation, Clark accused Callahan of having an "inappropriate relationship" with a seminarian, which Roshon interpreted to mean a homosexual relationship with a person who was under Callahan's tutelage.[5] Clark also told Roshon of Callahan's "bizarre behavior," including slamming a child's bicycle against a wall, and said that Callahan had breached a confidence involving a moderator and a seminarian.

On or about August 18, 1998, Robert Clark, Robert Coppola, Richard Smith, and Susan Staples Smith, along with other Church officers, submitted a complaint[6] against Callahan to the conference, the body from which Callahan derived the authority to practice ministry. The ecclesiastical complaint accused Callahan of "horrible" and "irrational" behavior at council meetings, of interfering with the relationship between Roshon and the Church, of breaching an unspecified confidence, and of "fl[ying] into a rage." It further alleged that Callahan picked up a child's bicycle, laid it down, and fled when he saw a member of the Church approaching, "suggesting some kind of wrongdoing." Finally, the ecclesiastical complaint accused Callahan of misconduct with respect to the Church's pledge cards, of mailing a stuffed rat to the Church treasurer, and of calling the congregation "evil." The above-named defendants repeated these remarks in subsequent meetings with a "Response Team"

---

[5]Callahan claims other, "yet to be identified" defendants "similarly have accused Callahan of a homosexual relationship," and that the chairman of the pastoral search committee (who is not named as a defendant) also told Roshon that Callahan was involved in a "gay relationship" with a seminarian.

[6]We will refer to this as the "ecclesiastical" complaint, to distinguish it from the civil complaint that Callahan filed against the defendants. See note 7, *infra.*

assembled by the conference to investigate the ecclesiastical complaint against Callahan.

On August 31, 1998, according to Callahan's complaint, Charles H. Harper, the area minister of the Metropolitan Boston Area office of the United Church of Christ, "contacted prospective employers of Rev. Callahan, and informed others, without a need to know, that 'charges' had been filed against Rev. Callahan." Harper also demanded that Callahan inform other churches to which he had applied that "charges" had been filed against him. Under the auspices of the conference, Harper initiated a "disciplinary process" in response to the ecclesiastical complaint.

A committee on the ministry established by the conference held a series of disciplinary sessions against Callahan on April 28, May 5, and May 12, 1999. The committee heard testimony regarding Callahan's concerns that the Church's search committee was excluding homosexuals and lesbian ministers, and that it had declined to interview a white minister who was in an interracial marriage. The committee also heard testimony from Clark, Coppola, Smith, and Staples Smith as to the allegations in their complaint against Callahan. Harper also appeared at the hearing and "was instrumental in influencing" the committee's decision.

On May 18, 1999, the committee issued its four-page decision.[7] The committee determined that Callahan had violated his duty "to work cooperatively and collegially with those whom he had been called to serve" by improperly disparaging the leaders and other members of the Church, and by failing to keep confidential an administrative discussion with a lay leader after having agreed to do so. The committee also found that Callahan had interfered with the search process of the Church. By a vote of eleven to zero with three abstentions, the committee suspended Callahan's standing as a minister in the Metropolitan Boston Association indefinitely.

Callahan could apply for reinstatement on completion and report to the committee of a "complete physiological examina-

[7]Significantly, the decision noted that "[t]hese [disciplinary] proceedings were ecclesiastical only and were not intended to resolve any issues under the civil or criminal law."

tion with a particular emphasis on neurological issues, including full medical testing for Alzheimer's [disease]," as well as a complete psychological examination. Callahan also had to authorize representatives of the committee "to communicate their concerns to the health care providers before the examinations, to examine fully all records of the examinations, and to discuss the results of the examinations with the health care providers." The decision provided that Callahan could file a written appeal with the registrar of the Metropolitan Boston Association of the conference within sixty days.

Callahan appealed from the decision to the review panel of the conference, which affirmed the suspension on September 17, 1999. Callahan then filed a complaint, alleging discrimination based on perceived sexual orientation and disability, with the Massachusetts Commission Against Discrimination (MCAD). The MCAD dismissed the complaint for lack of subject matter jurisdiction. See G. L. c. 151B, § 1 (5) ("nothing herein shall be construed to bar any religious or denominational institution or organization . . . from taking any action with respect to matters of employment, discipline, faith, internal organization, or ecclesiastical rule, custom, or law which are calculated by such organization to promote the religious principles for which it is established or maintained"). After Callahan appealed, the MCAD affirmed its dismissal on May 2, 2001. On June 29, 2001, Callahan filed the civil action now at issue.

2. *Congregational versus hierarchical.* In denying the defendants' motion to dismiss, and to reconsider the denial, the judge determined that "[b]oth the Supreme Court of the United States and the [Supreme Judicial Court] have distinguished between the level of First Amendment protection afforded to hierarchical and congregational church structures," citing *Maryland & Va. Eldership of the Churches of God v. Church of God at Sharpsburg, Inc.*, 396 U.S. 367, 368 (1970) (Brennan, J., concurring); *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 722 (1871); and *Antioch Temple, Inc. v. Parekh*, 383 Mass. 854, 860-862 (1981). The rationale for this perceived distinction appears to lie in the establishment by hierarchical churches of rules and regulations for internal discipline and government,

and in the creation of tribunals for resolving disputes on these matters.[8] See *Antioch Temple, Inc.* v. *Parekh, supra* at 861, and cases cited. "In a hierarchical church structure, a local church is but an integral and subordinate member of a larger, general church organization." *Id.*, citing *Wheeler* v. *Roman Catholic Archdiocese of Boston*, 378 Mass. 58, 62 n.2, cert. denied, 444 U.S. 899 (1979). A congregational church, by contrast, "is self-governing . . . 'strictly independent of other ecclesiastical associations, and so far as church government is concerned, owes no fealty or obligation to any higher authority.' " *Antioch Temple, Inc.* v. *Parekh, supra* at 860, quoting *Watson* v. *Jones, supra*. The motion judge interpreted the differentiation enunciated in these cases as according less deference to congregational churches.

We do not read either of the United States Supreme Court cases cited by the judge, however, as supporting judicial intrusion into matters of religious doctrine involving congregational churches. *Maryland & Va. Eldership of the Churches of God* v. *Church of God at Sharpsburg, Inc., supra* at 367, involved a church property dispute. The Court's brief per curiam opinion dismissed the appeal as lacking a substantial Federal question, because the State court's resolution of the dispute "involved no inquiry into religious doctrine." *Id.* at 368. Justice Brennan's concurring opinion in that case, moreover, strongly cautioned courts *against* resolving doctrinal controversies when deciding church property disputes, whether the church polity is hierarchi-

---

[8]According to one legal commentator, "[a] rule of deference to church authority requires courts to identify the authority to whom they will defer." Laycock, Towards a General Theory of the Religion Clauses: The Case of Church Labor Relations and the Right to Church Autonomy, 81 Colum. L. Rev. 1373, 1413 (1981). Differentiating between hierarchical and congregational churches was a useful way for the Supreme Court to identify which ecclesiastical authority was entitled to deference. See *id.* The highest ecclesiastical authority of a hierarchical polity can be identified without resort to a "searching . . . inquiry" to identify whoever is responsible for a particular issue. See *id.* "In congregational churches, the highest authority is not so easy to identify. Unavoidably, secular courts are authorized to determine who, under the rules of the church, is entitled to bind it. The hierarchical rule and the congregational rule are formulations of the same basic principle of deference to church authority; the differences reflect application of the principle to slightly different facts." (Footnotes omitted.) *Id.* at 1413 & n.301, citing *Antioch Temple, Inc.* v. *Parekh*, 383 Mass. 854 (1981).

cal or congregational. See *id.* at 368-370 (Brennan, J., concurring). *Watson* v. *Jones, supra* at 724-727, which likewise concerned a conflict over the use of church property, set out approaches for enforcing property disputes depending on the organizational structure of the church.[9] See *Maryland & Va. Eldership of the Churches of God* v. *Church of God at Sharpsburg, Inc., supra* at 368-370 (Brennan, J., concurring). Indeed, we relied on both of these cases when we held in *Antioch Temple, Inc.* v. *Parekh, supra* at 860, that "[i]f a church is deemed congregational, the First Amendment [to the United States Constitution] does not bar a civil court from giving effect to an authoritative resolution by the governing church body *of a church property or related dispute* as long as the governing body followed its own rules in reaching that resolution" (emphasis added).

The controversy in *Antioch Temple, Inc.* v. *Parekh, supra* at 855, "began as an action to recover property" but grew to encompass a variety of other issues, including who was the true pastor and president of the plaintiff corporation (Antioch), and who could control and use the property that was in Antioch's name. The parties agreed to submit the issues to a master, whose report was confirmed by the Superior Court. *Id.* at 858. On ap-

---

[9]*Watson* v. *Jones*, 80 U.S. (13 Wall.) 679 (1871), in fact, eloquently explains why this court should not interfere in the disciplinary process administered by the conference, the authority from which Callahan derives his ministerial credentials:

"The right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine, and to create tribunals for the decision of controverted questions of faith within the association, and for the ecclesiastical government of all the individual members, congregations, and officers within the general association, is unquestioned. All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it. But it would be a vain consent and would lead to the total subversion of such religious bodies, if any one aggrieved by one of their decisions could appeal to the secular courts and have them reversed. It is of the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organism itself provides for."

*Id.* at 728-729.

peal, the aggrieved party claimed that Antioch was a hierarchical church whose ecclesiastical court had already ruled on the issues, foreclosing consideration by the secular courts. *Id.*

In determining the existence of jurisdiction over the case, this court acknowledged the limits that the First Amendment places on judicial resolution of church property disputes. *Antioch Temple, Inc.* v. *Parekh, supra* at 859-860. It noted that "both this court and the United States Supreme Court have distinguished between hierarchical and congregational church structures," and that the role of the court may differ accordingly. *Id.* at 860. However, "in either case the courts, in effect, will honor the decision of the governing body chosen by the church members themselves before the dispute arose." *Id.* After examining the corporate documents of both Antioch and the national church organization it once belonged to, this court concluded that Antioch was a congregational church and that the Superior Court had properly exercised jurisdiction over the dispute. *Id.* at 863-864.

The court, however, went on to analyze whether, in acting to remove the aggrieved party as pastor and to resign from the national organization, Antioch's board of directors "followed the by-laws to which its members, including [the aggrieved party] subjected themselves," citing *Maryland & Va. Eldership of the Churches of God* v. *Church of God at Sharpsburg, Inc., supra,* and *Watson* v. *Jones, supra,* as authority for such an inquiry.[10] See *Antioch Temple, Inc.* v. *Parekh, supra* at 864-865. The court ultimately affirmed the judgment of the Superior Court, determining that it "does no more than honor the decisions of the governing body of a congregational church." *Id.* at 865.

Other courts have declined to distinguish between congregational and hierarchical churches when determining whether they may exercise subject matter jurisdiction over disputes arising from the termination or discipline of a minister or church

---

[10]As previously noted, we do not interpret these cases to authorize secular intrusion into matters of congregational church discipline. It is clear from the court's discussion that it continued to view, or at least characterize, the conflict as a "church property dispute[]." See *Antioch Temple, Inc.* v. *Parekh, supra* at 866-868.

member. See, e.g., *Heard* v. *Johnson,* 810 A.2d 871, 879 n.4
(D.C. 2002) ("[A] congregational church's internal organization
provides no nuance that would change its standing under the
First Amendment or that would require a different constitutional
analysis from that afforded to a hierarchical church"); *Guinn* v.
*Church of Christ of Collinsville,* 775 P.2d 766, 772 n.18 (Okla.
1989) ("Disciplinary decisions made by churches within this
[congregational] form of government are no less fair or deserv-
ing of judicial deference than decisions made by churches
structured in a hierarchical fashion"). See also *Daniels* v. *Union
Baptist Ass'n,* 55 P.3d 1012, 1014 (Okla. 2001) ("congregational
churches . . . are no more subject to judicial oversight than are
ones with a hierarchical form of government"). At least one
legal commentator also has criticized the making of such distinc-
tions in this context. See Laycock, Towards a General Theory
of the Religion Clauses: The Case of Church Labor Relations
and the Right to Church Autonomy, 81 Colum. L. Rev. 1373,
1414 (1981) ("Regulation for congregational churches and
autonomy for hierarchical churches would deny free exercise to
the former and arguably tend to establish the latter"). The
judicial distinction between congregational and hierarchical
churches, while perhaps convenient for ascertaining organiza-
tional authority, see Laycock, *supra* at 1413, does not justify
secular intrusion into disputes involving matters of church
governance. "[T]he First Amendment prohibits judicial
encroachment into church decisions where those decisions turn
on church policy or on religious doctrine or practice. . . .
[T]his prohibition includes church decisions concerning the
employment of ministers because selection and termination of
clergy is a core matter of ecclesiastical self-governance not
subject to interference by a [S]tate." *Heard* v. *Johnson, supra* at
882.

Today we hold that congregational as well as hierarchical
churches are entitled to autonomy "over church disputes touch-
ing on matters of doctrine, canon law, polity, discipline, and
ministerial relationships." *Williams* v. *Episcopal Diocese of
Mass.,* 436 Mass. 574, 579 (2002). See *Alberts* v. *Devine,* 395
Mass. 59, 72, cert. denied sub nom. *Carroll* v. *Alberts,* 474 U.S.
1013 (1985) ("the First Amendment prohibits civil courts from

intervening in disputes concerning religious doctrine, discipline, faith, or internal organization"). To conclude otherwise would violate fundamental precepts of the First Amendment and the Massachusetts Constitution, including art. 46, § 1, of the Amendments, guaranteeing free exercise of religion, and art. 11 of the Amendments, which provides: "[A]ll religious sects and denominations, demeaning themselves peaceably, and as good citizens of the commonwealth, shall be equally under the protection of the law; and no subordination of any one sect or denomination to another shall ever be established by law."[11] Any language suggesting the contrary in *Antioch Temple, Inc.* v. *Parekh, supra,* is overruled.

3. *Treatment of Mass. R. Civ. P. 12 (b) (1) motion.* Callahan's complaint as amended, asserts three claims against all of the defendants: defamation, intentional infliction of emotional distress, and violation of G. L. c. 151B, § 4 (discrimination based on perceived sexual orientation and on disability, and retaliation for statements in support of rights of others). In addition, Callahan asserts claims against Harper and the conference for breach of contract; against Coppola, Clark, Smith, Staples Smith, and Harper for tortious interference with prospective advantageous relationships; and against the conference for violation of (and "inducing a violation of") his right to privacy. The defendants moved to dismiss the complaint under Mass. R. Civ. P. 12 (b) (1), arguing all six claims arise from ecclesiastical proceedings over which the court lacked subject matter jurisdiction to review as a matter of First Amendment law. ·

Before proceeding to the merits of the defendants' argument, we must first resolve how the court should treat such a motion in these circumstances. "[A] motion under Mass. R. Civ. P. 12 (b) (1) . . . that is unsupported by affidavit presents a 'facial attack' based solely on the allegations of the complaint, taken as true for purposes of resolving the complaint." *Hiles* v. *Episcopal*

---

[11]In deciding that our State constitutional protection extended to Judaism as well as Christianity, this court declared in *Glaser* v. *Congregation Kehillath Israel,* 263 Mass. 435 (1928): "These great guaranties of religious liberty and equality before the law of all religions are not confined to adherents of the Christian religion or to societies and corporations organized for the promotion of Christianity." *Id.* at 437. By the same token, those "great guarantees" are not confined to adherents of hierarchically structured churches.

*Diocese of Mass.*, 437 Mass. 505, 516 n.13 (2002), citing *Holt* v. *United States*, 46 F.3d 1000, 1002 (10th Cir. 1995). By contrast, a rule 12 (b) (1) motion supported by affidavits places the burden on the plaintiff to prove jurisdictional facts. See *Hiles* v. *Episcopal Diocese of Mass.*, *supra* at 515-516. See also *Williams* v. *Episcopal Diocese of Mass.*, *supra* at 577 n.2.

Here, the defendants attached seven exhibits to their motion, including the "Interim Senior Pastor Covenant Contract" between Callahan and the Church[12] and the committee on the ministry's decision suspending Callahan, to enable the court to make a factual determination on the merits of Callahan's claim of jurisdiction.[13] Because the defendants submitted no affidavits, however, the judge accepted Callahan's factual allegations as true for purposes of evaluating the motion. See *Hiles* v. *Episcopal Diocese of Mass.*, *supra* at 516 n.13.

We think the judge construed *Hiles* too narrowly. Other decisions make it clear that a judge may consider documents and other materials outside the pleadings that are not affidavits when ruling on a rule 12 (b) (1) motion. See, e.g., *Williams* v. *Episcopal Diocese of Mass.*, *supra* at 575 (in addition to affidavits, judge considered "documents submitted by the parties"); *Watros* v. *Greater Lynn Mental Health & Retardation Ass'n, Inc.*, 421 Mass. 106, 108-109 (1995) (court's consideration of "materials outside the pleadings" did not mandate conversion of rule 12 [b] [1] motion into motion for summary judgment).[14] See also *Schaer* v. *Brandeis Univ.*, 432 Mass. 474, 477 (2000) (exhibits attached to complaint may be taken into account when evaluating motion under Mass. R. Civ. P. 12 [b] [6], 365 Mass. 754 [1974]). By supporting the motion with such extra-pleadings material, the defendants contest the ac-

---

[12]By Callahan's own admission, the contract is "not at issue in this litigation as Callahan's lawsuit arose from conduct that took place after he had severed his relationship with [the Church]."

[13]Callahan in turn attached five exhibits to his opposition to the motion, including a September 8, 1998, letter to him from Harper and a letter dated July 17, 1998, to Clark from Roshon (the forum leader).

[14]In *Watros* v. *Greater Lynn Mental Health & Retardation Ass'n, Inc.*, 37 Mass. App. Ct. 657, 661, 663 (1994), *S.C.*, 421 Mass. 106 (1995), the defendant supported its motion to dismiss by relying on the entire record of prior proceedings, as well as the pleadings.

curacy (rather than the sufficiency) of the jurisdictional facts pleaded by the plaintiff. See *Valentin* v. *Hospital Bella Vista*, 254 F.3d 358, 363 (1st Cir. 2001). Such a "factual challenge" to subject matter jurisdiction gives no presumptive weight to the averments in the plaintiff's complaint, and requires the court to address the merits of the jurisdictional claim by resolving the factual disputes between the plaintiff and the defendants. See *Hiles* v. *Episcopal Diocese of Mass., supra* at 516, quoting *Valentin* v. *Hospital Bella Vista, supra.* See also *Holt* v. *United States, supra* at 1003. The judge's memorandum of decision on the original motion indicates that she considered at least some of the exhibits submitted by the defendants, i.e., documents pertaining to Callahan's MCAD claim and the written decision of the committee on the ministry. Callahan thus bears the burden of proving jurisdictional facts to support each claim.

However, even if we were to disregard the exhibits submitted and simply accepted the factual allegations of Callahan's complaint as true, most of the claims would still fail on constitutional grounds. The complaint makes evident that the events forming the basis of Callahan's claims, except the defamation claim against Clark, arose from the "disciplinary review process" initiated, pursued, or conducted by the various defendants against Callahan. "The First Amendment states that 'Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof.' The principle that this language precludes jurisdiction of civil courts over Church disputes touching on matters of doctrine, canon law, polity, discipline, and ministerial relationships is firmly established in Massachusetts case law" (citations omitted). *Williams* v. *Episcopal Diocese of Mass., supra* at 579. We examine each claim individually in light of that principle.[15]

a. *G. L. c. 151B.* Our decision in *Williams* v. *Episcopal Diocese of Mass., supra*, disposes of Callahan's G. L. c. 151B claim against all the defendants. There we held that "allowing

---

[15]The judge noted in her memorandum of decision that "some aspects of the [defendants'] motion [pursuant to Mass. R. Civ. P. 12 (b) (1), 365 Mass. 754 (1974),] appear to be based on [Mass. R. Civ. P.] 12 (b) (6)[, 365 Mass. 754 (1974)]." Because we hold that the court has no subject matter jurisdiction over most of Callahan's claims, however, we need not analyze whether they fail to state a claim on which relief can be granted.

jurisdiction of employment discrimination claims [between a minister and his Church] would result in governmental intrusion into an area of religious freedom forbidden by the principles of the First Amendment." *Id.* at 578, citing *McClure* v. *Salvation Army*, 460 F.2d 553, 560 (5th Cir.), cert. denied, 409 U.S. 896 (1972). Callahan attempts to distinguish this case from *Williams* on three grounds. First, he argues that his claim "do[es] not implicate either [Church] or [conference] policy." This argument completely overlooks the constitutional basis on which the *Williams* holding rests. "It is hard to conceive . . . how a court could inquire into the reasons for the defendants' decisions regarding [Callahan's] ministry without intruding into matters of the internal management of [the Church and the conference]. Irrespective of whether the defendants' treatment of [Callahan] and [his] ministry was based on legitimate or illegitimate grounds, [Callahan's] claims, by their very nature, implicate the defendants' First Amendment rights. To argue otherwise diminishes the importance of the constitutional separation of church and State." *Williams* v. *Episcopal Diocese of Mass.*, *supra* at 580.

Callahan further contends that the alleged discrimination and retaliation by lay defendants Coppola, Clark, Smith, and Staples Smith "occurred after he had left the [C]hurch," thus removing those parties from the realm of First Amendment protection. However, it is not the timing of the defendants' actions but the ecclesiastical context in which they were taken that controls. See *Hiles* v. *Episcopal Diocese of Mass.*, *supra* at 514. "If adjudication of [Callahan's] claims would implicate matters of ecclesiastical relationships, the courts should not intrude." *Williams* v. *Episcopal Diocese of Mass.*, *supra*. Finally, Callahan points out that he "is not asking the courts to interpret canonical law or polity of a hierarchical church." In light of our discussion in Part 2, *supra*, this argument is unavailing as well.

b. *Breach of contract.* The *Williams* case also disposes of the breach of contract claim against Harper and the conference. As previously noted, this claim arises not from any purported violation of the written contract between Callahan and the Church, but from the defendants' alleged failure to follow their own written procedures in carrying out the investigation and

disciplinary proceedings against Callahan. The procedures are purportedly set forth in a variety of documents (which Callahan dubs the "Ministry Contract Documents") identified as the Manual on Ministry, "Pastoral Misconduct," "Reviewing Authorized Ministries," and "Guidelines."[16] Without addressing whether these publications actually establish a contractual relationship between Callahan and Harper or the conference, "[w]e decline to venture into the realm of interpreting internal guidelines and procedures that have been adopted by the [United Church of Christ]. As discussed above, a church must be free to decide for itself what its obligations to its ministers are, without being subject to court interference." *Williams* v. *Episcopal Diocese of Mass.*, *supra* at 581, citing *Dowd* v. *Society of St. Columbans*, 861 F.2d 761, 764 (1st Cir. 1988). See *Serbian E. Orthodox Diocese for the U.S. & Can.* v. *Milivojevich*, 426 U.S. 696, 713 (1976) (prohibiting inquiry into whether church judicatory followed requisite ecclesiastical procedures in removing bishop).

c. *Tortious interference with potential advantageous relationships.* Callahan alleges that Harper, Clark, Coppola, Smith, and Staples Smith knowingly sought to interfere with his attempt to obtain another interim pastor position, and that their interference "was motivated by a spiteful, malignant purpose unrelated to any legitimate interest of theirs." Although Callahan does not specify how the defendants allegedly committed this tort, we infer it was by reporting the ecclesiastical complaint to the conference, and in communicating the existence of these "charges" against Callahan to his potential employers. As Callahan does not identify any prospective employers in his complaint, he failed to meet his burden to prove that such employers were outside the constitutional protection of freedom of religion. We may infer that the prospective employers were other churches within the conference. Publication of the ecclesiastical complaint against Callahan therefore was "inextricably part of the . . . disciplinary process." *Hiles* v. *Episcopal Diocese of Mass.*, *supra* at 514. Alternatively, evaluation of the allegedly malicious interference would "require the

---

[16]These documents are not part of the record on appeal.

court to inquire into the motives of these defendants to determine whether the Church's disciplinary procedures were properly invoked," *id.* at 516, and is thus prohibited.

d. *Intentional infliction of emotional distress.* Callahan claims (without citing any specific acts) that the conduct of all defendants except the church was "extreme and outrageous and it was foreseeable that such conduct would cause and did in fact cause severe emotional distress." Consistent with his burden under Mass. R. Civ. P. 12 (b) (1), Callahan has made no showing that the defendants were "acting outside the purview of the . . . disciplinary procedures" when they allegedly so acted. See *Hiles* v. *Episcopal Diocese of Mass., supra* at 518. Accordingly this count must be dismissed.

e. *Violation of right to privacy.* Callahan's complaint includes a count against the conference for "violation and inducing a violation of [his] right to privacy." Callahan alleges that the decision by the conference's committee on the ministry, "without any medical or other basis to do so, requires Rev. Callahan, as a condition of future employment, to relinquish all rights of privacy in his communications with, and the findings of, his health care providers." He further alleges that the conference demanded "full disclosure of his medical records and publication of same to all prospective employers as a condition of his right to practice ministry." Callahan claims that these requirements constitute an "unreasonable, substantial and serious" invasion of his privacy.

The written decision by the committee states that Callahan may apply for reinstatement of his standing on completing and reporting to the committee the results of complete physiological and psychological examinations. Another condition for reinstatement required Callahan to authorize the Committee to "examine fully all records of the examinations," and to discuss them with the health care providers. Once Callahan complied with these conditions, "the [committee] shall review the results of the examinations and re-evaluate [Callahan's] readiness to resume the practice of ordained ministry." The decision also provides that Callahan "shall further authorize that this report may be

disseminated to prospective employers."[17] We assume that "this report" refers to the written decision.

This case is distinguishable from *Alberts* v. *Devine*, 395 Mass. 59, cert. denied sub nom. *Carroll* v. *Alberts*, 474 U.S. 1013 (1985), on which Callahan relies. There we held that the First Amendment would not bar judicial inquiry into an invasion of privacy claim by a minister against clerical superiors who wrongfully induced the plaintiff's psychiatrist to divulge confidential medical information. See *id.* at 72-73. Our holding was grounded on the fact that the case did *not* involve the plaintiff's qualifications to serve as a minister. *Id.* at 73. In the case at bar, the committee on the ministry was trying to ascertain Callahan's fitness to continue as a minister, and the court has no jurisdiction to determine what type of information a church may require in order to determine a minister's fitness. "It is clear that the assessment of an individual's qualifications to be a minister, and the appointment and retirement of ministers, are ecclesiastical matters entitled to constitutional protection against judicial or other State interference." *Id.* at 72-73, citing *Kedroff* v. *St. Nicholas Cathedral*, 344 U.S. 94, 116 (1952). See *Hiles* v. *Episcopal Diocese of Mass.*, *supra* at 510. The court therefore must dismiss this claim as well.

f. *Defamation*. The defendants originally sought dismissal of the defamation claim pursuant to Mass. R. Civ. P. 12 (b) (6), because Callahan failed to set out the allegedly defamatory statements verbatim, and to allege the dates of publication and identities of specific defendants. Callahan then amended his complaint to name the defendants and allege their specific instances of defamation, most of which arise from the ecclesiastical complaint, investigation, and committee decision regarding Callahan. Because these allegations derive solely from actions that are "inextricably part of the Church disciplinary process," *Hiles* v. *Episcopal Diocese of Mass.*, *supra* at 514, the claims against Coppola, Clark, Smith, and Staples

---

[17]The decision does not specify whether this condition is limited to any "prospective employer" within the United Church of Christ, but at oral argument, Callahan's counsel conceded that it would "probably not" apply to other denominations.

Smith collectively, and against the conference, lie outside the jurisdiction of the court.

A conversation between Clark and Roshon in or about early July, 1998, however, merits discussion. As previously noted, Callahan alleges that Clark told Roshon "he would do everything he could to ensure that Callahan never practiced ministry again." We do not view this statement as reasonably susceptible of a defamatory meaning. See *Foley* v. *Lowell Sun Publ. Co.*, 404 Mass. 9, 11 (1989). However, during that same conversation, according to the amended complaint, "Clark accused Callahan of having 'an inappropriate relationship' with a seminarian, which Ms. Roshon understood to signify that Callahan, a minister, was engaged in a homosexual relationship with a seminarian under his tutelage."[18] Clark also told Roshon (although it is unclear when) that Callahan had engaged in "bizarre behavior," including "slamming a child's bicycle against a wall," and that "he had breached a confidence involving a moderator and a seminarian."

Roshon served as a "forum leader" in the church. Although the complaint does not explain what this position entails, the parties do not assert that Roshon played any role in the disciplinary procedure against Callahan. Moreover, the above-mentioned conversation between Clark and Roshon took place, according to Callahan, "about a month" before Clark and the other defendants forwarded their ecclesiastical complaint against Callahan to the conference. Cf. *Hiles* v. *Episcopal Diocese of Mass.*, *supra* at 513 n.12. At least on the present record, it remains possible that some of Clark's alleged statements to Roshon fall outside the church disciplinary process. "The absolute First Amendment protection for statements made by a Church member in an internal church disciplinary proceeding would not apply to statements made or repeated outside that context." *Id.*

Accepting as true the allegation that Clark told Roshon that Callahan had an "inappropriate relationship" with a seminarian, we cannot say Callahan fails to state a claim on which relief

[18]Callahan further asserts that another member of the congregation, who is not named as a defendant in this case, also told Roshon that Callahan was involved in a "gay relationship" with a seminarian.

can be granted as against Clark individually.[19] Compare *Madsen* v. *Erwin*, 395 Mass. 715, 726-727 (1985). Moreover, the statements that Callahan engaged in bizarre behavior, threw a child's bicycle against a wall, and breached another's confidence arguably impute an unfitness for employment as a minister and may be slanderous per se. See *Brown* v. *Journal Newspaper Co.*, 219 Mass. 486, 487-488 (1914). The judge did not err in refusing to dismiss Callahan's claim against Clark as to these statements.

4. *Conclusion.* The order of the Superior Court is vacated and the case is remanded for an order of dismissal of the plaintiff's complaint as to the claims alleging violation of G. L. c. 151B, breach of contract, tortious interference with prospective advantageous relationships, intentional infliction of emotional distress, invasion of privacy, and the claims of defamation against the defendants Robert Coppola, Richard Smith, Susan Staples Smith, and the Massachusetts Conference of the United Church of Christ. The defamation claim as to the defendant Robert Clark's statement that "he would do everything he could to ensure that [the plaintiff] never practiced ministry again" also must be dismissed. The order as to the claim of defamation against the defendant Clark based on his other alleged statements to Jean Roshon is affirmed.

*So ordered.*

---

[19] A false accusation of homosexuality may be actionable. See *Gray* v. *Press Communications, LLC*, 342 N.J. Super. 1, 9-10 (2001), and cases cited.